## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROSANNA GRDINICH,

         *Plaintiff,*

    v.

PHILADELPHIA HOUSING
AUTHORITY,

         *Defendant.*

CIVIL ACTION
NO. 16-03070

**PAPPERT, J.**                                          **May 17, 2017**

### MEMORANDUM

Rosanna Grdinich was the Equal Employment Opportunity Officer for the Philadelphia Housing Authority ("PHA") for nearly a decade. In 2008, she was transferred from that position after she told PHA's executive director that she had received anonymous calls about him allegedly sexually harassing a female employee. Grdinich contends that for roughly three years thereafter she was repeatedly transferred, harassed and retaliated against as a result of that conversation.

Grdinich, who still works for PHA, sued the entity for sex discrimination, race discrimination, retaliation and hostile work environment under Title VII of the Civil Rights Act of 1964 and discrimination, retaliation and hostile work environment in violation of the Pennsylvania Human Relations Act ("PHRA"). PHA moves for summary judgment, asserting that Grdinich failed to administratively exhaust her sex-discrimination and hostile work environment claims and that the remaining claims fail under the *McDonnell Douglas* standard. After a thorough review of the record and the parties' filings, the Court grants PHA's motion.

1

# I.

## A.

PHA hired Grdinich as its EEO Officer in 1999. (Grdinich Dep., at 30:17–18, ECF No. 35-1.) Grdinich was responsible for fielding and investigating discrimination complaints from PHA employees. (Am. Compl. ¶ 12.) In the late summer or early fall of 2008, Grdinich spoke to PHA Executive Director Carl Greene. As he usually did, Greene asked her what types of complaints she was handling. (Grdinich Dep., at 54:1–5.) Grdinich told him she had recently received three anonymous phone calls reporting that Greene had harassed one of PHA's female employees. (*Id.* at 54:6–9.) When Greene heard this, he walked away. (*Id.* at 55:8–9.) Grdinich never opened an investigation into those anonymous calls because she later learned the woman they concerned no longer worked for PHA. (*Id.* at 55:12–18.)

Grdinich remained the EEO Officer until December 17, 2008, when she was transferred to the PHA police department, where her job duties changed substantially. (*Id.*, at 59:2–12; Am. Compl. ¶ 14.) PHA never explained the transfer; her supervisor at the time, Fred Pasour, told her that her salary would not be affected and that PHA "need[ed] [her] expertise in the police department." (Grdinich Dep., at 59: 8–10.) Pasour then took on the responsibilities of conducting equal employment opportunity investigations, though the EEO Officer position remained unfilled. (*Id.* 59:11–13.)

Grdinich contends that this transfer was the beginning of a pattern of retaliation for telling Greene about the anonymous calls earlier that year. At the police department, Grdinich worked under Chief of Police Richard Zappile, who she had previously investigated and interviewed in her capacity as EEO Officer. *See* (Grdinich

Dep., at 45:23–46:5). Grdinich felt that being assigned to work for Zappile was retaliatory, as she believed he would wish to retaliate against her. *See* (Compl. ¶ 17–18); *cf.* (Grdinich Dep., at 45:23–46:5). In 2009, PHA cut Grdinich's salary by approximately $20,000. *See* (Hr'g Tr., at 7:17); (Def.'s Mem., at Ex. C, ECF No. 32-6). Her salary was never restored to the amount it was when she was EEO Officer. *See generally* (Def.'s Mem., at Ex. C, ECF No. 32-6). Grdinich was shifted between different departments on multiple occasions between 2009 and 2013, often to positions below her level of training and expertise. *See* (Grdinich Dep., at 107:16–19). She contends she was placed in these roles with little to no training, (*id.* at 2:22–24), and was given a needlessly isolated workspace for one of the positions in a further act of retaliation, (*id.* at 71:19–21).

Grdinich, who is white, claims that the PHA discriminated against her because of her race. After she was transferred to PHA's admissions department, a "black female supervisor" berated her and accused her of receiving a ticket for running a red light while driving a PHA vehicle. (*Id.* at 93:13–24.) Shortly after that, a supervisor reviewed Grdinich's time sheets and asked her why she was late when she arrived at 8:02 a.m. instead of 8:00 a.m. (*Id.* at 94:1–10.) That supervisor also required Grdinich to work the front desk of the admissions department on Mondays, when the department was busiest. (*Id.* at 101:15–24.)

In 2011, PHA reestablished the EEO Officer position as part of a 2010 settlement with the Pennsylvania Human Relations Commission ("PHRC") in an unrelated matter. Under the settlement agreement's terms, PHRC had to approve of PHA's hire for the new position. (Hr'g Tr., at 17:7–19, ECF No.

17:12–19); *see also* (Def.'s Mem., at Ex. G, ECF No. 32-10). After nearly three years, PHA began searching for a new EEO Officer to fill the position left vacant after Grdinich's transfer in May 2008. *See* (Def.'s Mem., at Ex. E, ECF No. 38-8). Those seeking the position were required to have a bachelor's degree. Grdinich applied for the position even though she lacked a degree. *See* (*id.* at Ex. H, ECF No. 32-11); (Grdinich Dep., at 119:4–15*)*.

During its search, PHA appointed Stacey Thomas to be interim EEO Officer. (Def.'s Mem., at Ex. F, ECF No. 32-9.) Thomas, who is African-American, also lacked a bachelor's degree but had eleven years' experience serving as a labor and employment specialist with PHA. (*Id.* at Ex. I, ECF No. 32-12.) An outside firm hired by PHA interviewed eighteen candidates— including Grdinich—before ultimately hiring Tracey Reid, who is African-American. *See* (Grdinich Dep., at 121:8–9). Reid held a bachelor's degree from Mansfield University and met the other requirements of the job posting. *See* (Def.'s Mem., at Ex. E); (*id.* at Ex. L, ECF No. 32-15). She had also worked for nearly eight years at the PHRC as a Human Relations Representative. *See* (*id.* at Ex. L, ECF No. 32-15).

When Grdinich did not get the job, she filed an administrative charge with the PHRC and the Equal Employment Opportunity Commission ("EEOC") on November 23, 2011 (the "2011 charge"), alleging retaliation and race discrimination. *See* (*id.* at Ex. J, ECF No. 32-13). She filed another administrative charge on February 29, 2012 (the "2012 charge") claiming that she was harassed in retaliation for filing the 2011 charge. *See* (*id.* at Ex. M, ECF No. 32-16). The EEOC issued Grdinich a right to sue letter for

the 2011 and 2012 charges on March 18, 2016. *See* (Compl., at Ex. A). Grdinich's

Amended Complaint[1] consists of two counts. Count I alleges sex discrimination, race

discrimination, retaliation and a hostile work environment, all in violation of Title VII.

(Am. Compl., at 15.) Count II alleges violations of the PHRA based on the same

conduct.[2] (*Id.* at 16.)

## II.

Summary judgment is proper if there is no genuine issue of material fact and if,

viewing the facts in the light most favorable to the non-moving party, the moving party

is entitled to judgment as a matter of law. *Smathers v. Multi-Tool, Inc./Multi-Plastics,*

*Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* FED. R. CIV.

P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248

(1986). A mere scintilla of evidence in support of the non-moving party will not suffice;

there must be evidence by which a jury could reasonably find for the non-moving party.

*Id.* at 252. Summary judgment is appropriate where "the nonmoving party has failed to

make a sufficient showing on an essential element of her case with respect to which she

has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In

---

[1] After PHA answered Grdinich's Complaint and moved for judgment on the pleadings, Grdinich filed, without leave of the Court or consent from PHA, her Amended Complaint on January 23, 2017. (ECF No. 19.) PHA moved to dismiss the Amended Complaint. (ECF No. 20.) The Court denied that motion as moot when it took up PHA's summary judgment motion. (ECF No. 38.)

[2] Though her Amended Complaint alleges new facts, it describes the same protected activity and many of the same retaliatory actions as a case Grdinich filed in 2010. *See* Complaint, *Grdinich v. Phila. Housing Auth. et al.*, (No. 10-4954), (E.D. Pa. Sept. 22, 2010). There, Grdinich alleged violations of the First and Fourteenth Amendments, 28 U.S.C. § 1983 and the Pennsylvania Whistleblower Law based on retaliation for her same 2008 conversation with Greene. *See id.* Judge Jones dismissed both of Grdinich's federal counts with prejudice and declined to exercise supplemental jurisdiction over her state-law claim. *See* Order, *Grdinich v. Phila. Housing Auth. et al.*, (No. 10-4954), (E.D. Pa. Sept. 23, 2011).

reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.

PHA first argues that Grdinich failed to administratively exhaust any of the claims in the Amended Complaint relating to sexual harassment or a hostile work environment. *See* (Def.'s Mem., at 4–7). Before bringing a Title VII claim in Pennsylvania, a plaintiff must first file an administrative charge with the EEOC within 300 days of the alleged discrimination, 42 U.S.C. § 2000e-5(e)(1), or with the PHRA within 180 days of the same. 43 P.S. § 959(a). These deadlines are strictly construed under each statute. *Pourkay v. City of Philadelphia*, No. 06-5539, 2009 WL 1795814, at *4 (E.D. Pa. June 23, 2009) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997)). Plaintiffs generally must file a new EEOC or PHRC charge for each discrete act of discrimination. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, at 114–15 (2002) ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'").

Grdinich filed two separate PHRC charges and cross-filed each with the EEOC. (ECF Nos. 32-13 & 32-16.) The 2011 charge contained two counts, each based on PHA's failure to promote Grdinich in May of 2011. (ECF No. 32-13.) The first count attributes

that decision to retaliation; the second count to racial discrimination. (*Id.* at 2–3.) The 2012 charge comprises three counts: one alleging retaliation based on Grdinich's filing of the 2011 charge and two that repeat the counts in the 2011 charge. (*Id.* at 2–3); *see also* (Hr'g Tr., at 43:15–24). Spread across the two PHRC charges, these five counts— four of which center on PHA's failure to promote Grdinich in May 2011—represent the whole of Grdinich's administratively exhausted EEOC and PHRA claims. Three counts speak of retaliation and two speak of racial discrimination. None raise claims of sex discrimination or a hostile work environment. *See* (ECF Nos. 32-13 & 32-16). Grdinich therefore cannot maintain a Title VII or PHRA claim against PHA for sex discrimination or a hostile work environment because she has not administratively exhausted those claims.

In her response to PHA's motion, Grdinich did not even acknowledge, much less respond to, PHA's administrative exhaustion argument. *See generally* (Pl.'s Mem., ECF No. 34). At oral argument, Grdinich's counsel asserted that in the ensuing correspondence between Grdinich and the PHRC regarding these charges, Grdinich informed the PHRC of sex-based discrimination. There is no evidence in the record to support this belated assertion. While the breadth of Grdinich's lawsuit "is not defined by the allegations in the EEOC charge, but rather by the scope of the EEOC investigation which can reasonably be expected to grow out of that charge," *Scott v. Univ. of Del.*, 385 F. Supp. 937, 942 (D. Del. 1974) (quotations omitted), her administrative charges alleging discrimination based on race cannot, on the facts alleged in those charges, reasonably be expected to morph into sex discrimination claims. *See Revis v. Slocomb Indus., Inc.*, 814 F. Supp. 1209, 1219 (D. Del. 1993). "A

plaintiff will not be deemed to have made a claim with the EEOC if [she] provide[s] no facts that suggest such a claim." *Spencer v. Comcast Corp.*, No. 16-2589, 2017 WL 660854, at *3 (E.D. Pa. Feb. 17, 2017) (internal quotations omitted). This "prevent[s] a plaintiff from 'greatly expand[ing] an investigation simply by alleging new and different facts when [s]he [is] contacted by the Commission following [her] charge,'" *Barzanty v. Verizon PA, Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010) (quoting *Hicks v. ABT Assoc., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978)), or when faced with an uphill battle at summary judgment. PHA's motion is therefore granted with respect to Grdinich's sex discrimination and hostile work environment claims.

Grdinich has three administratively exhausted claims; her retaliation and race discrimination claims based on PHA's 2011 failure to promote her to EEO Officer and her claim that PHA retaliated against her for filing the 2011 charge. The Court considers each in turn.

## IV.

At summary judgment, employment discrimination cases are evaluated under the framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, Grdinich must first establish a *prima facie* case of discrimination or retaliation. If she does, PHA must articulate a legitimate nondiscriminatory reason for its action. If PHA does so, the burden shifts back to Grdinich to establish by a preponderance of the evidence that PHA's stated reason is pretextual. *See Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015); *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

**A.**

Grdinich alleges that in April of 2011, she applied for the newly open EEO Officer position but did not get the job, which she contends went to a less-qualified candidate. (Grdinich Dep., at 57:19–58:2.) Grdinich believes the decision not to promote her was retaliation for her conversation with Greene nearly three years earlier. PHA contends that Grdinich fails to make out a *prima facie* case of retaliation. In the alternative, it argues that it has offered a legitimate, nondiscriminatory reason for its hiring decision and that Grdinich cannot show that its proffered reason is pretextual.

To establish a *prima facie* case of retaliation under Title VII, Grdinich must offer record evidence that: (1) she engaged in a protected activity; (2) PHA took a materially adverse employment action after that protected activity; and (3) a causal link exists between Grdinich's protected activity and PHA's adverse action. *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006).

**i.**

Grdinich contends that she engaged in protected activity when she "informed Greene that she had received three anonymous calls regarding sexual abuse and harassment of female employees by [him]." (Am. Compl. ¶ 13); *see also* (Grdinich Dep., at 53:13–54:10). She also argues that by virtue of being an EEO Officer, all of her activities constitute protected activity. (Hr'g Tr., at 66:15–16).

Under Title VII,

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has *opposed any practice* made an unlawful employment practice by this subchapter, or

because he has made a charge, testified, assisted, or *participated in any manner* in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a) (emphasis added). The statute thus protects two classes of retaliation victims: "those who oppose discrimination made unlawful by Title VII (the 'opposition clause')" and "those who participate in certain Title VII proceedings (the 'participation clause')." *Moore*, 461 F.3d at 341.

"Opposition" requires, "at the very least, an informal protest of discriminatory employment practices." *King v. City of New Kensington*, No. 06-1015, 2008 WL 4492503, at *21 (W.D. Pa. Sept. 30, 2008) (citing *Barber v. CSX Dist. Servs.* 68 F.3d 694, 701–02 (3d Cir. 1995)). "To determine if retaliation plaintiffs sufficiently 'opposed' discrimination," courts examine "the message being conveyed rather than the means of conveyance." *Moore*, 461 F.3d at 343. This demands a "case-specific inquiry." *Washco v. Fed. Express Corp.*, 402 F. Supp. 2d 547, 555 (E.D. Pa. 2005); *see also Scott v. Genesis Healthcare, Inc.*, No. 15-0916, at *19 (E.D. Pa. Aug. 22, 2016) (noting that protected opposition may include "writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support for co-workers who have filed formal charges" (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)). "When an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Daniels v. Sch. Dist. of Phila*, 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009) (quotations and alterations omitted)).

Grdinich testified at her deposition that when Greene asked what she was working on, she told him she had "just received three anonymous calls regarding him. [The callers] wouldn't say who they were. . . . They had said it was about another female and I expressed that to him. At that point, [Greene] did not speak to me again. He turned around, he walked away from me." (Grdinich Dep., at 54:6–11.) But there is no record evidence that Grdinich made even an informal protest regarding Greene's behavior or did anything more than tell him about the calls she received when he asked. Nor is there any evidence to suggest Grdinich expressed a *belief* that Greene had engaged in any form of employment discrimination. This does not constitute opposition under Title VII's anti-retaliation provision. *Cf. Barber*, 68 F.3d at 702 (noting that "informal protests" includes "making complaints to management," among other things). Under Grdinich's proposed approach, every statement made by an EEO Officer would be "opposition" for Title VII purposes. Grdinich provides no support for such a proposition and the Court is unaware of any.

The participation clause offers stronger protection to Title VII employees, though in a more limited scope. *See Slagle v. Cty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006) (quotations omitted); *Tithill v. Consol. Rail Corp.*, No 96-6868, 1997 WL 560603, at *3 (E.D. Pa. Aug. 26, 1997) (noting the participation clause covers "a narrower range of activities" than the opposition clause). Several courts in this Circuit have held that the participation clause only protects an employee once an EEOC charge is filed. *See Washco*, 402 F. Supp. 2d at 554–55 (collecting cases and noting that courts in this district have followed authority holding that "participation in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC is not

considered a protected activity under Title VII" (internal quotations omitted)); *Tuthill*,
1997 WL 560603, at *3–4 ("In order to establish a claim under the 'participation clause,'
the investigation, proceeding or hearing must fall within the confines of the procedures
set forth in Title VII."). This is because the "purpose of the 'participation clause' is to
protect access *to the EEOC*." *Tuthill*, 1997 WL 560603, at *3–4 (emphasis added)
(citing *Laughlin v. Metro. Wash. Airports Auth.*, 952 F. Supp. 1112, 1133 (E.D. Va.
1997)).

There is no evidence that any of the anonymous calls Grdinich received
pertained to formal charges with the EEOC. At oral argument, Grdinich's counsel
contended that she was protected by Title VII's anti-retaliation provision by virtue of
being PHA's EEO Officer. (Hr'g Tr., at 66:12–21.) Whether that is the case does not
appear to be settled in this Circuit, but courts in this Circuit have consistently held
that participation requires the filing of an actual EEOC charge. *See, e.g.*, *Washco*, 402
F. Supp. 2d at 554–55 (collecting cases). Title VII's anti-retaliation provision prohibits
employers from retaliating for participation "in an investigation, proceeding, or hearing
*under this subchapter*." 42 U.S.C. § 2000e–3(a). The relevant subchapter discusses
prohibited employment activity as well investigations by the EEOC, among other
things. Thus for the same reason courts require the initiation of formal Title VII
proceedings before the participation clause takes effect, the participation clause does
not offer blanket coverage to EEO Officers simply by virtue of their position.

### ii.

Even if Grdinich could show that she engaged in a protected activity when she
told Greene about the anonymous complaints, she cannot establish a *prima facie* case of

retaliation. While the PHA undoubtedly took an adverse employment action against her, *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."), Grdinich cannot show a causal connection between the protected activity and the adverse employment action. To do so, a plaintiff must "produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action.'" *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (quoting *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997))."

An employee "may rely on 'a broad array of evidence' to demonstrate the causal link between [her] protected activity and the adverse [employment] action taken." *Id.* at 260 (quoting *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)). An employee could rely, for example, on record evidence of an employer's "inconsistent explanations for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive.'" *Id.* (citations omitted). Grdinich cannot rely on temporal proximity alone, as the three years between her conversation with Greene and PHA's failure to promote her is not unduly suggestive of any retaliatory motive. *See, e.g.*, *Gulick v. City of Pittston*, 95 F. Supp. 2d 322, 335–36 (M.D. Pa. 2014) (collecting cases); *see also Fischer v. Transue*, No. 04-2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug 22, 2008) (noting Third Circuit precedent "suggest[s] that the difference in time must be measured in days, rather than in weeks or months, to establish causation on its own").

"[T]he mere passage of time," however, "is not legally conclusive proof *against* retaliation." *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892 (3d Cir. 1993) (emphasis added). Grdinich could also show a pattern of antagonism. While a pattern of antagonism sufficient to show retaliatory motive need not rise to the level of a hostile work environment claim, *Popko v. Pa. State Milton S. Hershey Med. Ctr.*, 2014 WL 3508077, at *9 (M.D. Pa. July 14, 2014) (citing *Staffieri v. Nw. Human Servs., Inc.*, No. 12-1612, 2013 WL 2245639, at *8 (E.D. Pa. May 22, 2013)), the employer's alleged antagonism must be consistent and continuous, *see Wright v. Shore Mem. Hosp.*, No. 11-5583, 2013 WL 6080072, at *12 (D.N.J. Nov. 19, 2013) (collecting cases and noting that "[c]ourts in this Circuit permit an inference of causation when there is a consistent, continuous course of discriminatory treatment"). "A pattern of antagonism . . . is more than a series of disciplinary actions; a plaintiff must 'offer [a] basis for linking the disciplinary actions to her [protected activity].'" *Wells v. Retinovitreous Assocs., Ltd.*, No. 15-5675, 2016 WL 3405457, at *3 (E.D. Pa. June 21, 2016) (quoting *Bartos v. MHM Corr. Servs., Inc.*, 454 F. App'x 74, 79 (3d Cir. 2011) (alterations in original)), *appeal pending*, *Wells v. Retinovitreous Assocs., Ltd.*, (No. 16-2962).

It is difficult to piece together the timeline of the alleged retaliatory acts which might make up a pattern of antagonism against Grdinich because her citations to the record are sparse and often do not fall within a clear timeframe. The evidence the Court has reviewed does not raise an inference of retaliatory motive on the part of PHA. Grdinich testified at her deposition that after her conversation with Greene in late 2008, her work vehicle was "taken away from [her] for no reason." (Grdinich Dep., at

39:15–16.)  When she later inquired why, she was simply told she "didn't need it"; when she asked how she would be able to do her investigations, she was told to "take the bus."  (*Id.* at 39:16–19.)  She also testified that between 2000 and 2008, Zappile made comments she felt were derogatory or discriminatory "on a regular basis,"  (*id.* at 41:15–20), though she could not recall any specific examples, (*id.* at 44:15–19).  Obviously, nothing Zappile said before the alleged protected activity was in retaliation for that activity.

Grdinich testified that when she was transferred to the police department in December of 2008, she was given a workspace that unnecessarily isolated from other employees like "an outcast."  (*Id.* at 71:19–24.)  Grdinich assisted with evictions as part of her new duties and testified that once—between January and February of 2009—she was sent out to participate in evictions with no protective gear.  (*Id.* at 65:1–10.)  She also testified that she overheard Zappile telling staff members not to eat lunch with her or speak to her, (*id.* at 74:21–75:3), and that an officer was transferred after Zappile saw him eating lunch with her, (*id.* at 75:3–76:14).  Grdinich's next transfer occurred three months later, when PHA placed her in the housing choice voucher investigations department; at that time she retained her job title and her responsibilities changed only "slightly."  (*Id.* at 83:23–84:11.)  Grdinich testified that her work situation continued to destabilize throughout 2009; her salary was reduced in June of that year as well.  (*Id.* at 84:15–23.)

The evidence, viewed as part of "the whole picture," *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997), is insufficient to show a pattern of antagonism toward Grdinich.  The antagonism noted above—the entirety of what Grdinich points to in her

response—occurred within roughly six months of her 2008 conversation with Greene. *See* (Grdinich Dep., at 39:15–19 84:15–24). Other potential evidence of antagonism includes four transfers at unknown points in time over the span of two years before PHA's decision not to hire her for the EEO Officer position. Given the nearly three years between Grdinich's 2008 conversation with Greene and the alleged retaliation in 2011, as well as the lack of specificity in the record regarding timing, no reasonable juror could conclude Grdinich has shown that PHA engaged in a pattern of antagonism directed at her. *See Wright*, No. 11-5583, 2013 WL 6080072, at *12 (collecting cases). *Compare Bartos*, 454 F. App'x at 75–76, 78–79 (finding antagonism insufficiently consistent and continuous where plaintiff was subject to five disciplinary actions over the course of fifteen months), *and Wells*, 2016 WL 3405457, at *1, 3 (E.D. Pa. June 21, 2016) (finding four disciplinary actions in four-month span insufficient to show a pattern of antagonism), *with Robinson*, 982 F.2d at 895 (upholding district court's finding of a pattern of antagonism where employee was subjected to a "constant barrage of written and verbal warnings, inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge").[3]

## B.

Grdinich also contends that PHA's decision not to promote her to EEO Officer in May of 2011 was based on her race. To establish a *prima facie* case of racial discrimination based on a failure to hire or promote, Grdinich must show that she: (1) belongs to a protected class; (2) applied for and was qualified for the available position;

---

[3] Even if Grdinich had established a *prima facie* case of retaliation, PHA has offered a legitimate nondiscriminatory reason for its decision not to hire her for the EEO Officer position in 2011, something Grdinich cannot show to be pretextual. *See infra* subsections IV.B.ii & IV.B.iii.

(3) suffered an adverse employment decision; and (4) PHA either ultimately filled the position with someone outside of the protected class or continued to seek applicants from those with plaintiff's qualifications. *Fuller v. Global Custom Decorating*, No. 04-0285, at *15 (W.D. Pa. Jan. 5, 2007) (citing *Barber*, 68 F.3d at 698); *see also Bray v. Marriot Hotels*, 110 F.3d 986, 989–90 (3d Cir. 1997).

### i.

Grdinich has established a *prima facie* case of race discrimination. The parties do not dispute that Grdinich belongs to a protected class based on her race. *See* (Def.'s Mem., at 13). Nor do they dispute that she applied for the position. *See* (*id.* at Ex. H, ECF No. 32-11). At oral argument, counsel for PHA acknowledged that Grdinich was qualified by having previously held the position for nearly a decade, even though she lacked the bachelor's degree required by the job posting. *See* (Hr'g Tr., at 25:22–26:9). Finally, Grdinich was rejected for the EEO Officer position and PHA hired someone from outside of Grdinich's protected class. *See* (Hr'g Tr., at 59:7–10).

### ii.

Because Grdinich has made out a *prima facie* case, the burden of production under *McDonnell Douglas* shifts to the PHA. This burden is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). An "employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* PHA has done so here.

After PHA transferred Grdinich to the police department in 2008, it left the position of EEO Officer vacant until early 2011, though other employees handled EEO

complaints and investigations in addition to their other duties. *See* (Grdinich Dep., at 57:12–58:2). Then, as part of the 2010 settlement with the PHRC in an unrelated lawsuit, PHA re-created the EEO Officer position. *See* (Hr'g Tr., at 17:4–19); (Def.'s Mem., Ex. G, ECF No. 32-10). In early 2011, PHA posted the position on its website with an application closing date of May 20, 2011. (*Id.* at Ex. E, "Job Posting," ECF No. 32-8.) After conducting a search, PHA initially appointed an interim EEO officer who lacked a bachelor's degree but had eleven years' experience serving as a labor and employment specialist with PHA. (*Id.* at Ex. I, ECF No. 32-12.) PHA continued its search and an outside firm it hired conducted eighteen interviews, including a telephone interview with Grdinich, before it ultimately hired Tracey Reid as EEO Officer. (Def.'s Mem., at 15); *see* (Grdinich Dep., at 121:8–9). Reid had previously worked at PHRC—which, by virtue of its settlement agreement with PHA had effective veto power over the hire—from 2000 to 2008. (*Id.* at Ex. L, 32-15.) She also held a bachelor's degree from Mansfield University and met the other requirements of the job posting. *See* (Def.'s Mem., at Ex. E); (Def.'s Mem., at Ex. L, ECF No. 32-15).

The record evidence amply demonstrates that PHA had a legitimate nondiscriminatory reason for its employment decision. *See Fuentes*, 32 F.3d at 763. PHA introduced the job posting itself, (Def.'s Mem., at Ex. E), as well as the qualifications of both its interim and ultimate hires for the position, (*id.* at Exs. I & L). This evidence permits the conclusion that PHA found Thomas and Reid better-suited for the position than Grdinich. Under the low burden *McDonnell Douglas* imposes at this stage, PHA's stated reasons show a legitimate nondiscriminatory reason for its decision not to promote Grdinich. *See Burdine*, 450 U.S. at 259 ("[T]he employer has

discretion to choose among equally qualified candidates, providing the decision is not based upon unlawful criteria.").

### iii.

The burden thus shifts back to Grdinich to show that PHA's legitimate, nondiscriminatory reason was pretextual. Though Grdinich need not *prove* pretext at this stage, to survive summary judgment she must offer record evidence "rebutting the employer's proffered legitimate reasons" that would "allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes*, 32 F.3d at 764 (citations omitted).

Grdinich may show pretext in two ways: One is by producing evidence showing that PHA's reason for failing to promote her "was so plainly wrong that it cannot have been [its] real reason." *Lane v. Potter*, No. 08-4151, 2010 WL 996505, at *10 (E.D. Pa. Mar. 17, 2010) (citing *Fuentes*, 32 F.3d at 765; *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir. 1997)). To succeed under this method, Grdinich may not simply show that PHA's "decision was wrong or mistaken," *id.* at 765, but must instead demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765. Alternatively, Grdinich may "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause" of the decision. *Id.* She may do so

by showing that PHA had previously subjected her to unlawful discrimination or treated similarly situated people outside of her protected class more favorably. *Id.*

Grdinich has not produced any evidence to succeed on the first method. She points to nothing in the record to show implausibilities or inconsistencies in PHA's proffered legitimate nondiscriminatory reason. She therefore must produce sufficient evidence from which a factfinder could conclude that her race more likely than not was a motivating or determinative cause in PHA's decision not to promote her.

She attempts to do so by highlighting four deposition excerpts. She first points to the deposition testimony of Anthony Guidotti, her supervisor when she was transferred to the police department in 2009. Guidotti stated that Zappile told him he hoped to "run [Grdinich] out" of the police department. (Guidotti Dep., at 13:12–13 ECF No. 35-3.) At one meeting between Guidotti, Zappile and Pasour in 2009, Pasour suggested making Grdinich a commander, as it would be commensurate with her salary at that point. *See* (*id.* at 28:3–7). Guidotti testified that Zappile (who was white) said that "over [his] dead body" and that "there's never going to be a . . . White female" commander under him. (*Id.* at 13:25–14:2.) This could be evidence of pretext were there anything in the record showing that Zappile played a role, however small, in PHA's 2011 decision not to hire Grdinich as EEO Officer. *See Mason v. SEPTA*, 134 F. Supp. 3d 868, 873–74 (E.D. Pa. 2015). There is none.

Grdinich next points to three portions of her own testimony, all of which are insufficient to show pretext. Grdinich refers to her repeated transfers to various departments within PHA. She testified that at some point between July 2010 and the filing of her lawsuit, she served in PHA's admissions department. Grdinich testified of

her manager at that time: "I believe she was on the Greene team and I believe she was out to get me." (Grdinich Dep., at 93:9–12.)  Grdinich also references her testimony that another PHA supervisor made comments about her being the only white person in the department.  (*Id.* at 104:1–21.)  Finally, Grdinich testified that another supervisor at PHA, Juanita Maiga, asked her why she did not arrive at 8:00 a.m. as required when Grdinich arrived at 8:02 a.m.  (*Id.* at 94:1–10.)  Grdinich testified that "black girl[s]" who arrived even later were not reprimanded.  (*Id.* at 94:21–24.)

Like Guidotti's testimony, these comments do not undermine PHA's stated reasons for its failure to promote Grdinich.  While Grdinich has arguably adduced evidence of apparent animus on the part of others, she has not pointed to any evidence that calls into question PHA's stated reasons for hiring someone else to fill the EEO Officer position.  *See Frantz v. Ferguson Enters.*, No. 07-4083, 2009 WL 222419, at *6 (E.D. Pa. Jan. 26, 2009) ("In cases where employees offer discriminatory comments in order to show pretext, it is important to consider the relationship between the speaker and the employee, the timing of the comment, and the purpose and content of the statement (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1112 (3d Cir. 1997)); *see also Leung v. SHK Mgmt., Inc.*, No. 98-3337, 1999 WL 1240961, at *9 (E.D. Pa. Dec. 21, 1999) (noting that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given weight, particularly if they were made temporally remote from the date of the decision" (citations omitted)).

Much of Grdinich's testimony is based on her personal belief that race animated PHA's decision, *see, e.g.*, (Grdinich Dep., at 93:9–12), something that is insufficient to carry her  burden under *McDonnell Douglas*.  There is no record evidence to support a

finding that PHA's proffered reason for hiring Thomas and then Reid for the EEO Officer position in May of 2011 was pretextual. Further undermining Grdinich's argument that PHA's proffered reasons were pretext is the fact that at the time of this lawsuit, the EEO Officer position is held by Bridget Walsh, who is white. (Grdinich Dep., at 121:23–122:3.) In any event, as her counsel noted at oral argument, much of Grdinich's alleged evidence of pretext occurred "after the [EEO Officer] position was filled." (*Id.* at 62:11–12.) *Cf. Morris v. G.E. Fin. Assur. Holdings*, 2001 U.S. Dist. LEXIS 20159, at *26 (E.D. Pa. Dec. 5, 2001) (refusing to credit events occurring after the adverse employment action as evidence of pretext).

## C.

The 2012 charge also alleges that PHA retaliated against Grdinich for filing the 2011 charge. (ECF No. 32-16, at 2.) Again, to establish a *prima facie* case of retaliation under Title VII, Grdinich must show that: (1) she engaged in a protected activity; (2) PHA took a materially adverse employment action after that protected activity; and (3) a causal link exists between Grdinich's protected activity and PHA's adverse action. *Moore*, 461 F.3d at 341.

Grdinich's 2012 charge states in relevant part:

I am subjected to harassment in my present assignment as Project Management Coordinator. I am treated differently in but not limited to these examples: I am the only departmental employee that has to account for details of my daily activities. Other employees are told that they are not to have lunch with me. A supervisor asked me why I don't look for another job and does not have a full time position for me. I am the only employee who is assigned to work between two different departments.

(ECF No. 32-16, at 2.) This appears to be a charge for retaliation, as Grdinich also refers to Section 5(d) of the PHRA, which prohibits such conduct. (*Id.*)

**i.**

Grdinich's decision to file the 2011 charge was clearly established protected activity. It is less clear, however, whether PHA took a materially adverse action against her after her protected activity. An action is materially adverse when it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)).

Grdinich noted in her 2012 charge that she was forced to work between two departments. (ECF No. 32-16, at 2.) She handled those different roles as the "FSS coordinator" for PHA. *See* (Grdinich Dep., at 109:17–22.) But in her deposition Grdinich suggested she held that position since 2009—two years before she engaged in the protected activity of filing. *See* (*id.* at 112:18–19). In any event, while Grdinich notes other acts in her 2012 charge, she does not refer the Court to evidence in the record sufficient to establish a *prima facie* case of retaliation in her response. *Cf. DeShields v. Int'l Resort Properties, Ltd.*, 463 F. App'x 117, 119–20 (3d Cir. 2012) (noting that at summary judgment, "[j]udges are not like pigs, hunting for truffles buried in the briefs" (quoting *United States v. Starnes*, 583 F.3d 196, 216 (3d Cir. 2009))).

Even if Grdinich could show that PHA took a materially adverse action against her, there is no evidence demonstrating a causal link between the two events. Grdinich could rely on "'a broad array of evidence' to demonstrate the causal link between [her] protected activity and the adverse [employment] action taken," such as record evidence

of inconsistencies, a pattern of antagonism or an unusually suggestive temporal proximity. *Carvalho-Grevious*, 851 F.3d at 259 (quoting *Marra*, 497 F.3d at 302).

Grdinich cannot rely on temporal proximity to show causation, as the record does not show when, specifically, her supervisor made the allegedly retaliatory comments. The comments could have occurred anywhere between November 23, 2011, when Grdinich filed the 2011 charge, and February 29, 2012, when she filed the 2012 charge. There is no record evidence to show that the behavior of her then-supervisor, General Manager Enrico Crispo, occurred within days of filing her 2011 charge. *See, e.g.*, *Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597, 617 (E.D. Pa. 2014) ("[T]emporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.").

Grdinich also points to alleged discrimination that occurred after the 2012 charge. "[T]he allowable scope of an individual law suit is not defined by the allegations in the EEOC charge." *Scott*, 385 F. Supp. at 942. Rather, it is determined by the scope of the EEOC investigation which can reasonably be expected to grow out of that charge." *Id.* "Thus, any kind of discrimination which is like or related to allegations contained in the charge" may be included in a plaintiff's suit. *EEOC v. Allegheny Airlines*, 436 F. Supp. 1300, 1304 (W.D. Pa. 1977).

Under that standard, however, Grdinich has not pointed to sufficient evidence of retaliation, even after her 2012 charge. Grdinich acknowledged that since 2014 she has not experienced any retaliation from PHA. (Grdinich Dep., at 114:24–115:13.) She also testified that she believed other, subsequent acts of harassment were based on her race, rather than a retaliatory intent. *See* (*id.* at 93:7–94:24). Thus even if the Court were to

look well beyond the content of her 2012 charge, she has not made out a *prima facie* case of retaliation under Title VII or the PHRA.

## V.

In her response to PHA's motion, Grdinich's counsel relies heavily on an accusation that PHA failed to produce documents, namely emails, during discovery. By choosing to forego a substantive response to some of PHA's arguments, counsel seeks to attribute the paucity of record evidence in her favor to a discovery dispute attributable to her own *laissez- faire* approach to the case.

The Court permitted the parties six months of discovery. *See* (ECF No. 11). On the eve of the March 13, 2017 discovery deadline, Grdinich's counsel for the first time contacted the Court regarding objections PHA asserted to certain document production requests in November, 2016. Grdinich's counsel had never filed a motion to compel. The Court convened a March 17 telephone conference, (ECF No. 31), during which the parties agreed to the entry of a protective order addressing PHA's confidentiality concerns, something which would allow counsel to receive whatever emails she claimed she was entitled to. PHA immediately sent counsel a proposed protective order. Grdinich's counsel returned the document three days later; PHA promptly made the requested changes and sent it back for signature. Counsel sat on the agreed-upon protective order for 10 days, until March 30, when she returned it to PHA's attorneys and, just over an hour later, faxed the Court a letter complaining that PHA had not produced any additional emails. Before returning the executed protective order, Grdinich's counsel filed her response to PHA's motion on March 27, one week before it was due. (ECF No. 35.)

The Court scheduled another telephone conference, where it discussed the dispute's history and timeline, along with its view that Grdinich's counsel had been less than diligent in pursuing the case. *See* (ECF No. 31). Counsel requested a chance to review any emails produced pursuant to the protective order but stated that the Court could "move forward" and decide the motion on the papers as they existed at the time because she believed "1,000 percent" that the plaintiff had fully made her case and that "there is no doubt that there is a genuine issue of material fact as to all of Ms. Grdinich's claims." (Conf. Tr., at 11:4–23.) Counsel also asked if she could file a sur-reply brief if PHA's reply contained "new information" and was told that she could file a motion (required by the Court's Policies and Procedures) and the Court would consider it. Counsel elected not to do so.

In sum, counsel waited until the discovery deadline to complain about an objection her opponent made four months before. She then delayed in signing the protective order which would have facilitated her receipt of any additional emails and filed her response one week early in a transparent attempt to preserve the ability to argue that she could not meaningfully respond. The Court was then told that it could rule on the motion, something it does today based on a record counsel believes is more than sufficient to support her position.

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.